# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978

# MEMORANDUM OF LAW OF PLAINTIFFS AXA, CHUBB, MUNICH RE AMERICA, ONEBEACON INSURANCE GROUP, AND TIG[1] IN SUPPORT OF THEIR MOTION TO ASSESS DAMAGES AGAINST DEFAULTED DEFENDANTS FOR BUSINESS AND PROPERTY CLAIMS UNDER THE ANTI-TERRORISM ACT

---

[1]  As per the Affidavits filed Herewith as Exhibits C-G to the Affirmation of Sean P. Carter in Support of the Motion of Plaintiffs AXA, Chubb, Munich Re America, OneBeacon Insurance Group, and TIG (the "Carter Affirmation"), the AXA Companies Are AXA Art Insurance Company, AXA Global Risks (UK) Ltd., AXA CSA UK Branch; AXA Insurance Company, AXA Reinsurance Company, AXA Re, AXA Re Canadian Branch, AXA Re UK  Plc, AXA Versicherung, And SPS Re; The Chubb Companies are Chubb Custom Insurance Company, Chubb Insurance Company of Canada, Chubb Insurance Company of New Jersey, Chubb Indemnity Insurance Company, Federal Insurance Company, Great Northern Insurance Company, Pacific Indemnity Company and Vigilant Insurance Company; and the Munich Re Companies are American Alternative Insurance Corporation and The Princeton Excess and Surplus Lines Insurance Company and The Great Lakes (UK) Insurance Company.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................... ii

I.     INTRODUCTION ................................................................................................................ 1

II.    LEGAL ARGUMENT......................................................................................................... 3

    A.    The Measure of Damages is a Question of Law for the Court ....................................... 3

    B.    Monetary Losses and Expenditures Constitute Injuries to "Business and
        Property" Under the ATA................................................................................................. 5

        1.    The Anti-Terrorism Act ......................................................................................... 5

        2.    The Clayton Act...................................................................................................... 7

        3.    RICO ...................................................................................................................... 8

III.   METHOD OF PROVING DAMAGES............................................................................. 11

    A.    Damages Can Be Assessed Based Upon Affidavits and Documentary Evidence........ 11

    B.    This Court Can Rely Upon the Affidavits for This Assessment................................... 12

        1.    The Affidavit Evidence Regarding Movants' Aggregate Monetary
             Expenditures Provides a Competent Basis for Assessing Damages
             Against the Defaulted Defendants Under the ATA ................................................ 12

        2.    Movants Employed Accepted and Sound Processes and Procedures
             in Adjusting the September 11 Claims ................................................................. 13

        3.    The Categories of Monetary Losses ..................................................................... 15

            a)    Claim Indemnity Payments.......................................................................... 15

            b)    Claim Adjustment And Claim Legal Expenses .......................................... 16

IV.   CONCLUSION.................................................................................................................. 17

# TABLE OF AUTHORITIES

Page

CASES

Action S.A. v. Marc Rich & Co., Inc.,
　951 F.2d 504 (2d Cir. 1991) ...............................................................................11

Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines),
　125 F.3d 120 (3d Cir. 1997) ................................................................................3

Albizu v. Strohl,
　2005 U.S. Dist. LEXIS 27578 (E.D. Cal. 2005)..................................................9

Andy Warhol Found. for the Visual Arts, Inc. v. Barth & Dreyfuss,
　2006 U.S. Dist. LEXIS 294 (S.D. N.Y. 2006)....................................................11

Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose,
　282 F. Supp. 2d 126 (S.D. N.Y. 2003)................................................................9

Aqua Dredge, Inc. v. Stony Point Marina & Yacht Club, Inc.,
　183 A.D. 2d 1055 (N.Y. App. Div. 1992) ...........................................................4

Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
　651 F.2d 615 (9th Cir. 1981) ...............................................................................3

Ashland Management v. Janien,
　82 N.Y. 2d 395 (N.Y. 1993) ................................................................................4

Au Bon Pain Corp. v. Artect, Inc.,
　653 F.2d 61 (2d Cir. 1981)................................................................................12

Bankers Trust Co. v. Rhoades,
　741 F.2d 511 (2d Cir. 1984)................................................................................9

Birdsall v. Coolidge,
　93 U.S. 64 1876) .................................................................................................4

BMW of N. Am. v. Gore,
　517 U.S. 559 (1996)..........................................................................................10

Boim v. Quranic Literacy Institute,
　291 F.3d 1000 (7th Cir. 2002) ............................................................................5

Cablevision Sys. N.Y. City Corp. v. Lall,
　2004 U.S. Dist. LEXIS 15346 (S.D. N.Y. 2004)...............................................11

Chattanooga Foundry & Pipe Works v. Atlanta,
   203 U.S. 390 (1960)................................................................................7

D. Klein & Son, Inc. v. Good Decision, Inc.,
   2005 U.S. App. LEXIS 2764 (2d Cir. Feb. 15, 2005) ...........................3

EEOC v. Reno,
   758 F.2d 581 (11th Cir. 1985) ................................................................6

Evans v. City of Chicago,
   434 F.3d 916 (7th Cir. 2006) ..................................................................3

Fustok v. ContiCommodity Services, Inc.,
   873 F.2d 38 (2d Cir. 1989)....................................................................11

Garvin v. Greenbank,
   856 F.2d 1392 (9th Cir. 1988) ...............................................................4

Hamman v. United States,
   267 F. Supp. 420 (D. Mont. 1967).........................................................8

Hill v. Chemical Bank,
   799 F. Supp. 948 (D. Minn. 1992) .........................................................7

Home Placement Service, Inc. v. Providence Journal Co.,
   819 F.2d 1199 (1st Cir. 1987)................................................................4

Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.,
   196 F.3d 818 (7th Cir. 1999) ..................................................................8

Jones v. UNUM Life Ins. Co. of Am.,
   223 F.3d 130 (2d Cir. 2000) ..................................................................3

Maio v. Aetna Inc.,
   221 F.3d 472 (3d Cir. 2000)...................................................................9

McCready v. Blue Shield of Virginia,
   649 F.2d 228 (4th Cir. 1981) ..................................................................8

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,
   456 U.S. 353 (1982)................................................................................6

Mid-America Tablewares v. Mogi Trading Co.,
   100 F.3d 1353 (7th Cir. 1996) ...............................................................4

National Treasury Employees Union v. Federal Labor Relations Authority,
   856 F. 2d 293 (D.C. Cir. 1988) .............................................................3

New Mexico v. GE,
    467 F.3d 1223 (10th Cir. 2006) ...............................................................3

Northcross v. Bd. of Educ. of Memphis City Sch.,
    412 U.S. 427 (1973).................................................................................6, 10

Oscar Gruss & Son, Inc. v. Hollander,
    337 F.3d 186 (2d Cir. 2003).......................................................................3

Osofsky v. Zipf,
    645 F.2d 107 (2d Cir. 1981).......................................................................4

Panos v. Island Gem Enters.,
    880 F. Supp. 169 (S.D.N.Y. 1995) ............................................................3

Reiter v. Sonotone Corp.,
    442 U.S. 330 (1979)................................................................................ 7-8

Schwab v. Philip Morris USA, Inc.,
    2006 U.S. Dist. LEXIS 73196 (E.D.N.Y. 2006) ......................................9

Story Parchment Co. v. Paterson Parchment Paper Co.,
    282 U.S. 555 (1931)............................................................................... 4-5

Sutton v. Earles,
    26 F.3d 903 (9th Cir. 1994) .......................................................................4

Taffet v. Southern Co.,
    930 F.2d 847, 857 (11th Cir. 1991) ...........................................................8

Tamarin v. Adam Caterers, Inc.,
    13 F.3d 51, 54 (2d Cir. 1993)....................................................................11

The National Asbestos Workers Medical Fund v. Philip Morris, Inc.,
    74 F. Supp. 2d 221, 233-34 (E.D. N.Y. 1999) ..................................... 9-10

Time Warner Cable v. Browne,
    2000 U.S. Dist. LEXIS 6273 (S.D. N.Y. 2000)........................................12

Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,
    109 F.3d 105, 111 (2d Cir. 1997)........................................................ 11-12

Ungar v. The Palestine Auth.,
    325 F. Supp. 2d 15 (D. R.I. 2004) .............................................................5

United States v. Espinoza-Cano,
    456 F.3d 1126 (9th Cir. 2006) ...................................................................6

United States v. Jordan,
    915 F.2d 622 (11th Cir. 1990) .................................................................6

United States v. Sioux,
    362 F.3d 1241 (9th Cir. 2004) ..............................................................6

Wehrly v. United States,
    808 F.2d 1311 (9th Cir. 1986) ..............................................................6

White v. Mercury Marine,
    129 F.3d 1428 (11th Cir. 1997) .............................................................6

Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.,
    946 F.2d 1003 (2d Cir. 1991)................................................................3

**STATUTES**

Anti-Terrorism Act, 18 U.S.C. § 2331 et. seq. .................................................... *passim*

Clayton Act, 15 U.S.C. §§ 12 *et seq.* .......................................................... 6-8

Fed. R. Civ. P. 55(b)(2)................................................................................11

RICO ........................................................................................................ 6-9

**OTHER AUTHORITIES**

Lloyd Dixon and Rachel Kaganoff Stern, Compensation for Losses from the 9/11 Attacks
    (RAND Institute for Civil Justice 2004)................................................14

# I. INTRODUCTION

On September 11, 2001, members of the al Qaida terrorist network hijacked four commercial airliners, and used those planes as weapons in a coordinated terrorist attack on the United States (the "September 11th Attack"). The September 11th Attack resulted in the tragic loss of several thousand lives, personal injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center complex in New York City. Plaintiffs in the <u>Federal Insurance</u> action (Plaintiffs) are members of the insurance industry who, in accordance with their obligations under applicable policies of insurance, have paid well in excess of $5 billion to insureds who were killed, injured, or suffered property or other forms of economic damages as a result of the September 11th Attack.

Plaintiffs initiated this action by Complaint on September 10, 2003, seeking recovery for their direct and subrogated September 11th claims, as well as for the wrongful death and personal injury claims of several hundred victims of the September 11th Attack who elected to assign their claims to Plaintiffs. Plaintiffs filed a First Amended Complaint (FAC) and Amended Summons on March 10, 2004. The FAC asserts claims under several statutory and common-law theories, including claims under the Anti-Terrorism Act, 18 U.S.C. § 2331 et. seq. (ATA).

On September 29, 2005, Plaintiffs moved for entry of default judgments against 309 non-state defendants, based on their failure to appear to defend the claims against them after valid service of the FAC and Amended Summons.[2] On April 7, 2006, this Court entered an Order granting default judgments in favor of the plaintiffs and against those defendants as to liability. In that Order, the Court held that the amount of damages Plaintiffs were entitled to recover

---

[2] Exhibit A to the Carter Affirmation hereto describes the manner through which service upon each of those defendants was accomplished, as well as the date upon which service upon each of those defendants was perfected. Plaintiffs previously filed Exhibit A in connection with their September 29, 2005 Motion for Entry of Default Judgments.

against the defaulted defendants under the various theories of liability advanced in the FAC were to be determined later.

Movants AXA, Chubb, Munich Re America, OneBeacon and TIG (Movants) are plaintiffs in the <u>Federal Insurance</u> action who have asserted claims against the defaulted defendants under the ATA for "business and property" damages. More specifically, Movants have made payments to insureds for business, property and related damages those insureds suffered as a result of the September 11th Attack. Movants have asserted claims against the defaulted defendants under the ATA for all direct and subrogated business and property injuries associated with those payments, and the handling of the underlying insurance claims.[3]

In an effort to limit the scope of the necessary damages proceedings relative to the default judgments entered in their favor, Movants seek through the present Motion to establish the amount of damages they are entitled to recover for their ATA claims for injury to business and property from the defaulted defendants identified in Exhibit B to the Carter Affirmation hereto.[4] For the reasons set forth in further detail below, those damages may be measured under the ATA simply by calculating the amount of money Movants were compelled to expend under applicable policies of insurance as a result of the September 11th Attack, and trebling that aggregate figure.

---

[3] Certain of the Movants have also made payments under worker's compensation insurance policies for personal injuries or deaths resulting from the Attack. Although those payments constitute injuries to Movants' "business and property" as well, the underlying wrongful death and personal injury claims have been assigned to those Movants. The losses arising from those payments are therefore captured within the asserted wrongful death and personal injury claims. Plaintiffs will seek an assessment of damages for those wrongful death and personal injury claims, under the ATA and all other theories of liability, at a later date.

[4] On July 12, 2006, the Court vacated the default judgments previously entered against Al Aqsa Islamic Bank, Al Baraka Bancorp, Dallah Avco Trans Arabia, Sanabil, Inc., Sanabel al-Kheer and Tadamon Islamic Bank at the mutual request of plaintiffs and those defendants. Because the default judgments entered against those defendants have been vacated, those defendants have been excluded from the list submitted as Exhibit B to the Carter Affirmation. In addition, Movants have excluded defendant Samir Salah from the scope of the present Motion. Mr. Salah wrote to plaintiffs several months ago to request that Plaintiffs voluntarily vacate the default judgment entered against him. Plaintiffs have requested, but not yet received, additional information necessary to evaluate that request.

In the context of the default judgment proceedings against the defendants identified in Exhibit B to the Carter Affirmation, the detailed affidavits of Movants' officers and representatives, submitted in support of this Motion and attached as Exhibits C-G of the Carter Affirmation, provide a competent and appropriate evidentiary basis for setting the value of Movants' business and property damages under that standard.

## II.   LEGAL ARGUMENT

### A.   The Measure of Damages is a Question of Law for the Court

As the Second Circuit has recognized, the measure of damages applicable to a plaintiff's cause of action is a question of law to be determined by the Court. D. Klein & Son, Inc. v. Good Decision, Inc., 2005 U.S. App. LEXIS 2764 (2d Cir. Feb. 15, 2005); Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003); Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991). "Ultimately, therefore, 'it is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages in the first instance.'" Panos v. Island Gem Enters., 880 F. Supp. 169, 175 (S.D. N.Y. 1995), *citing* Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 651 F.2d 615, 620-21 (9th Cir. 1981).

Where a plaintiff is entitled to recover damages under a federal statute with remedial and deterrent objectives, the Court should liberally construe the remedies available thereunder to advance those goals. Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139 (2d Cir. 2000) (ERISA); New Mexico v. GE, 467 F.3d 1223, 1238 (10th Cir. 2006) (CERCLA); Nat'l Treasury Employees Union v. Fed. Labor Relations Auth., 856 F. 2d 293, 296 (D.C. Cir. 1988) (LMRA); Air Line Pilots Ass'n v. Continental Airlines (In re Continental Airlines), 125 F.3d 120, 135-136 (3d Cir. 1997) (Title VII), *cert. denied*, 522 U.S. 114 (1998); Evans v. City of Chicago, 434 F.3d 916, 925 (7th Cir. 2006) (RICO). As a result, more than one standard may be available for

measuring a plaintiff's damages under a federal statute. *See* Osofsky v. Zipf, 645 F.2d 107, 111 (2d Cir. 1981), *quoting* Birdsall v. Coolidge, 93 U.S. 64, 70 (1876) ("Still, it is obvious that 'there cannot be any one rule of damages which will apply in all cases, even where it is conceded that the finding must be limited to actual damages.'") The same is true under New York law. Ashland Management v. Janien, 82 N.Y. 2d 395, 403 (N.Y. 1993); Aqua Dredge, Inc. v. Stony Point Marina & Yacht Club, Inc., 183 A.D. 2d 1055, 1057-1058 (N.Y. App. Div. 1992).

Still, in matters such as this a plaintiff need not prove its damages under any applicable standard with mathematical certainty. Garvin v. Greenbank, 856 F.2d 1392, 1401 (9th Cir. 1988) (federal securities law); Sutton v. Earles, 26 F.3d 903, 918 (9th Cir. 1994) (FTCA); Home Placement Service, Inc. v. Providence Journal Co., 819 F.2d 1199, 1205 (1st Cir. 1987) (Sherman Act) (internal cites omitted). To the contrary, a plaintiff need only provide a rational evidentiary basis for calculating damages, which is not merely speculative or conjectural. As noted in Garvin, "Damages need not be proven to a mathematical certainty. Sufficient evidence must be introduced so that the court can arrive at an intelligent estimate without speculation and conjecture. It is for the judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages." 856 F.2d at 1401.

Moreover, when a lack of precision in calculating damages has resulted from the nature of defendant's wrong, "The risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages." Mid-America Tablewares v. Mogi Trading Co., 100 F.3d 1353, 1366 (7th Cir. 1996). *See, similarly,* Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562 (1931) ("It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of

uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.")

B.     Monetary Losses and Expenditures Constitute Injuries to
       "Business and Property" Under the ATA

Movants seek to establish damages under the Anti-Terrorism Act, one of the causes of action for which judgment has been entered against the defaulting defendants. For the reasons which follow, the Anti-Terrorism Act allows recover for movants' monetary losses and expenditures resulting from defendants' actions.

1.     The Anti-Terrorism Act

Although plaintiffs have obtained default judgments against these defendants under several theories of liability, this Motion concerns only the assessment of damages for their business and property damage claims under the ATA.[5] In enacting the ATA, Congress sought to deter acts of international terrorism, "by imperil[ing] the flow of terrorism's lifeblood, money." Ungar v. The Palestine Auth, 325 F. Supp. 2d 15, 16 (D. R.I. 2004). In furtherance of that objective, the ATA extends civil liability and penalties "to any point along the causal chain of terrorism" and "to the furthest reaches of the common law." Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1011, 1021 (7th Cir. 2002). Pursuant to that statute:

> Any national of the United States injured in his or her person, property or business by reason of an act of international terrorism... may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorneys' fees.

18 U.S.C. § 2333(a).

To this point, no Court has had occasion to consider the measure of damages to be applied to a claim for injury to "property or business" under the ATA. However, the "property

---

[5]     Movants will seek an assessment of damages under other theories of liability, and/or for other categories of injury, at an appropriate date in the future.

or business" language of the ATA directly tracks the language Congress used in describing the remedies and damages available under the Clayton Act[6] and Civil RICO statute,[7] two statutes with similar deterrent and remedial objectives. The decisions interpreting the damages available for property and business injuries under those statutes thus guide this Court's analysis of the measure of damages for Movants' property and business damage claims under the ATA, as "it is a long-established principle of statutory construction that similar statutory language should be construed similarly." United States v. Espinoza-Cano, 456 F.3d 1126, 1135 (9th Cir. 2006), *citing* Northcross v. Bd. of Educ. of Memphis City Sch., 412 U.S. 427, 428 (1973); United States v. Sioux, 362 F.3d 1241, 1246 (9th Cir. 2004). *See, similarly*, EEOC v. Reno, 758 F.2d 581, 583-84 (11th Cir.1985) (finding that because provisions of the Age Discrimination in Employment Act "were taken *in haec verba* from Title VII, decisions under the analogous section of Title VII are highly relevant to the issue before [the Court]"); White v. Mercury Marine, 129 F.3d 1428, 1434 (11th Cir. 1997) ("It is a familiar canon of statutory construction that courts should generally construe similar statutory language similarly.").

Indeed, because "prior construction by courts of similar statutory language used in a new statute is one means of divining congressional intent," *see* Wehrly v. United States, 808 F.2d 1311, 1314 (9th Cir. 1986), it would be inappropriate for this Court to not consider the interpretation of similar statutory text. *See also* Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 378-82 (1982); United States v. Jordan, 915 F.2d 622, 628 (11th Cir. 1990), *cert. denied*, 499 U.S. 979 (1991) ("Under accepted rules of statutory construction, it is generally presumed that Congress, in drafting legislation, is aware of well established judicial

---

[6]    15 U.S.C. §15 grants a cause of action to "any person who shall be insured in his business or property" by reason of an antitrust violation.

[7]    18 U.S.C. § grants a cause of action to "any person who shall be injured in his business or property" by reason of an antitrust violation.

constructions of other pertinent existing statutes.") Hill v. Chem. Bank, 799 F. Supp. 948, 952

(D. Minn. 1992) ("Congress is presumed to be aware of judicial interpretations of statutory

language when it intentionally incorporates the language of one statute into another statute.").

      2.     The Clayton Act

In interpreting the measure of damages available for injuries to business or property

under the Clayton Act and RICO, the federal courts have universally held that a plaintiff's loss or

expenditure of money constitutes an injury to both business and property, compensable under

those statutes. In allowing for civil recovery for victims of antitrust violations, the Clayton Act,

15 U.S.C. §§ 12 *et seq.*, provides as follows:

> Any person who shall be injured in his business or property by
> reason of anything forbidden in the antitrust laws may sue therefor
> in any district court of the United States . . . without respect to the
> amount in controversy, and shall recover threefold the damages by
> him sustained, and the cost of suit, including a reasonable
> attorney's fee.

15 U.S.C. § 15. In Reiter v. Sonotone Corp., 442 U.S. 330 (1979), the Supreme Court

affirmed that a loss of money is a form of damage to one's "property" for purposes of the

Clayton Act, even separate from damages to business. Id. at 338. In Reiter, retail purchasers of

hearing aids sued under the Clayton Act alleging a variety of antitrust violations, including

vertical and horizontal price fixing, resulting in higher costs to them. Defendants moved to

dismiss, arguing that merely paying higher prices did not result in an injury to one's "business or

property" within the meaning of the Act.

The Supreme Court squarely rejected the defendants' argument, and held that plaintiffs'

monetary losses were indeed compensable under the Clayton Act. Relying on Chattanooga

Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 396 (1960), the Court found no difficulty in

including a loss of money within the meaning of injury to business or property. In an opinion

which attracted no dissents, the Court held:

When a commercial enterprise suffers a loss of money it suffers an injury in both its "business" and its "property." But neither term is rendered redundant by recognizing that a consumer not engaged in a "business" enterprise, but rather acquiring goods or services for personal use, is injured in "property" when the price of those goods or services is artificially inflated by reason of the anticompetitive conduct complained of. The phrase "business or property" also retains restrictive significance. It would, for example, exclude personal injuries suffered. E.g., Hamman v. United States, 267 F. Supp. 420, 432 (D. Mont. 1967). Congress must have intended to exclude some class of injuries by the phrase "business or property." But it taxes the ordinary meaning of common terms to argue, as respondents do, that a consumer's monetary injury arising directly out of a retail purchase is not comprehended by the natural and usual meaning of the phrase "business or property." We simply give the word "property" the independent significance to which it is entitled in this context. A consumer whose money has been diminished by reason of an antitrust violation has been injured "in his . . . property" within the meaning of 4.

Reiter, 442 U.S. at 339. This decision has been universally followed in allowing antitrust damages to be awarded for loss of money. *See, e.g.*, Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc., 196 F.3d 818, 823 (7th Cir. 1999); Taffet v. Southern Co., 930 F.2d 847, 857 (11th Cir. 1991), *cert. denied*, 506 U.S. 1021 (1992); McCready v. Blue Shield of Virginia, 649 F.2d 228, 231 (4th Cir. 1981).

3.    RICO

The Reiter holding has been repeatedly extended to the application of similar language in the RICO context to damages suffered through loss of money. In RICO, civil recovery is afforded to plaintiffs damages as a result of racketeering activity as follows:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therfor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . .

18 U.S.C. § 1964(c). As with the Clayton Act, the language "injured in his business or property" in the RICO statute has been consistently interpreted to apply to monetary losses,

*including a subrogee's right to recover for amounts paid to an insured.* See The National

Asbestos Workers Medical Fund v. Philip Morris, Inc., 74 F. Supp. 2d 221, 233-34 (E.D. N.Y.

1999) (collecting cases), in which the plaintiff-insurer's right to seek recovery for economic

injuries suffered by the insured was confirmed – in this case, the direct costs of treatment paid by

the insurer for smoking-related illnesses:

> The recovery of pecuniary losses associated with physical injuries
> directly caused by racketeering conduct is consistent with the
> language of the RICO statute. Such claims, furthermore, would
> materially advance the statute's legislative purposes of deterring
> racketeering, in all its forms, and of remedying, as fully as
> practicable, the economic consequences of racketeering. Finally,
> the recovery of these pecuniary losses is consistent with the
> expansive scope of RICO's civil remedy provisions as consistently
> interpreted by the Supreme Court.

74 F. Supp. 2d at 229. Similarly, in Anglo-Iberia Underwriting Mgmt. Co. v.

Lodderhose, 282 F. Supp. 2d 126 (S.D. N.Y. 2003), following a default judgment in a RICO case

based upon fraud on an reinsurance agreement, damages were assessed by calculating the

amount of the premiums fraudulently paid to defendants. Id. at 128-29. *See also* Albizu v.

Strohl, 2005 U.S. Dist. LEXIS 27578 (E.D. Cal. 2005), a RICO claim predicated upon fraud, in

which damages were assessed using the value of the check tendered to defendants as a result of

the fraud. Id. at *34

More generally, money is property under RICO. See Bankers Trust Co. v. Rhoades, 741

F.2d 511 (2d Cir. 1984), *vacated and remanded on other grounds*, 473 U.S. 922 (1985)

("Bankers has alleged that it has been deprived of various sums of money by the defendants'

activities. There is no question that this constituted 'injur[y] in [its] business or property. . .'");

Schwab v. Philip Morris USA, Inc., 2006 U.S. Dist. LEXIS 73196, *69-70 (E.D.N.Y. 2006) ("*A

fortiori*, if money is property under the antitrust laws, it is property under RICO"); Maio v. Aetna

Inc., 221 F.3d 472, 484 (3d Cir. 2000).

Because the relevant language of the ATA directly tracks that of the Clayton Act and RICO, it is clear that money a plaintiff expends as a result of a violation of the ATA constitutes an injury to business and/or property, compensable under that statute. Northcross, 412 U.S. at 428. In keeping with that well established principle, the assessment of damages against the defaulted defendants for Movants' business and property claims under the ATA may be performed by calculating the money Movants expended as a result of the September 11th Attack and trebling that amount.[8]

For purposes of the present Motion, those monetary expenditures include: (1) the amounts Movants paid to their insureds for business, property, and related losses resulting from the September 11th Attack; and (2) amounts Movants expended in good faith to adjust the underlying insurance claims.[9] The National Asbestos Workers Medical Fund, 74 F. Supp. 2d at 233-34. In the context of the present default judgment proceedings, the detailed affidavits of Movants' officers and representatives, which attest to the aggregate value of those monetary expenditures, and describe the processes through which their companies analyzed and set the value of each claim submitted under an applicable "property insurance" policy, provide a competent evidentiary basis for setting the value of Movants' claims for business and property injury under the ATA.

---

[8]     Movants are entitled to seek punitive damages under the ATA as well. However, the assessment of punitive damages against these defendants should not be undertaken until the compensatory value for all Movants' claims against these defendants has been set, including the assigned wrongful death and personal injury claims. Under Supreme Court jurisprudence, punitive damages must bear a reasonable relationship to the harm caused. BMW of N. Am. v. Gore, 517 U.S. 559, 580-82 (1996). Accordingly, Movants reserve their right to seek or award of punitive damages against the defaulted defendants at an appropriate point in the future.

[9]     Given the potential availability of other measures of damage for these claims under the ATA, Movants reserve their right to seek recovery under another appropriate measure, or to submit evidence of additional damages under the standard advanced herein, in relation to proceedings against the remaining defendants.

## III. METHOD OF PROVING DAMAGES

This section first summarizes the evidentiary standards for assessing damages in the context of default judgment proceedings, and then discusses the specific elements of the damage claims and evidence offered in relation to Movants' claims for relief under the ATA.

### A.    Damages Can Be Assessed Based Upon Affidavits and Documentary Evidence

Having already entered default judgments against these defendants as to liability under Fed. R. Civ. P. 55(b)(2), this Court may assess damages without holding an evidentiary hearing, instead relying on the affidavits and other documentary evidence presented by Movants.  As one Second Circuit case explained:

> Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that, in order to determine the amount of damages in the context of a default judgment, "the court may conduct . . . a hearing." We have held that, under Rule 55(b)(2), "it [is] not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment." Fustok v. ContiCommodity Services, Inc., 873 F.2d 38, 40 (2d Cir. 1989); *see* Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993) ("not necessary for the district court to hold a hearing to fix damages after a default judgment had been entered where the court had 'relied upon detailed affidavits and documentary evidence supplemented by the District Judge's personal knowledge of the record gained during four years involvement with the litigation.'"); Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991) (where district judge was "inundated with affidavits, evidence, and oral presentations" a full evidentiary hearing was not necessary).

Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997); *see also* Cablevision Sys. N.Y. City Corp. v. Lall, 2004 U.S. Dist. LEXIS 15346, *3 (S.D. N.Y. 2004).  Andy Warhol Found. for the Visual Arts, Inc. v. Barth & Dreyfuss, 2006 U.S. Dist. LEXIS 294, *6 (S.D. N.Y. 2006).

In connection with the Court's analysis of whether the affidavits and documentary evidence provide a "basis for the damages specified in the default judgment," Transatlantic

Marine, 109 F.3d at 111, plaintiffs are entitled to "all reasonable inferences" from the evidence they offer, given the default setting. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); Time Warner Cable v. Browne, 2000 U.S. Dist. LEXIS 6273, *2 (S.D.N.Y. 2000).

B.    This Court Can Rely Upon the Affidavits for This Assessment

Movants have carefully prepared these affidavits to explain to this Court the bases upon which they now seek relief. For the reasons which follow, this Court can recognize them as credible evidence, and assess damages accordingly.

1.    The Affidavit Evidence Regarding Movants' Aggregate Monetary Expenditures Provides a Competent Basis for Assessing Damages Against the Defaulted Defendants Under the ATA

In keeping with the foregoing standards, Movants may establish the value of their business and property damages under the ATA in the context of the present default judgment proceedings merely by submitting affidavits which describe, in general detail, the current aggregate value of the monetary expenditures and losses as a result of the September 11th Attack. Without question, such affidavits provide a rational basis for assessing damages under the governing measure, which is neither speculative nor conjectural. Furthermore, an assessment of damages against the defaulted defendants based on affidavit evidence of the aggregate value of Movants' monetary expenditures and losses as the result of the September 11th Attack will advance the remedial and deterrent purposes of the ATA, as well as the public policy favoring prompt payment of claims made by an insured to an insurer, and is therefore particularly appropriate. Accordingly, Plaintiffs respectfully submit that this Court may validly assess damages against the defaulted defendants for Movants' business and property claims under the ATA based solely on the affidavit evidence regarding the amount of money Movants expended as a result of the September 11th Attack, and trebling that amount.

2.     Movants Employed Accepted and Sound Processes and
       Procedures in Adjusting the September 11 Claims

Although such additional detail is unnecessary in the present context, the affidavits

submitted by Movants also provide extensive descriptions of the thorough claims adjustment

processes through which their companies verified their obligations to compensate their insureds

for losses sustained as a result of the September 11th Attack, and determined the fair value of

each claim submitted. While each insurer's process varies slightly, the affidavits confirm that

Movants followed longstanding, well-established principles and procedures applicable to the

adjustment of claims in responding to the losses of their insureds following the September 11th

Attack. In general terms, those processes involved, where feasible: confirmation of proper

notice of all potential claims; verification of coverage under, and measurement of the claims

against, the provisions of the policies of insurance; the protection of property from further loss,

including reasonable repairs;[10] the separation of damaged from undamaged property; review of

accounting records, bills, invoices and other documents; analysis of available receipts

documenting increased costs and lost income; and visual examination of the damaged property.

In relation to the processes described above, and as further explained in the affidavits

submitted herewith, the claims of Movants' insureds were subject to scrutiny by trained or

experienced claims adjustment professionals, and this included in many instances analysis and

review by outside professionals, such as certified public accountants, engineers, architects, and

construction cost specialists. Moreover, the handling of the September 11th claims by those

professionals was subject to internal review and audit by management. In accordance with

established practices, Movants' management personnel received and regularly reviewed reports

prepared by other company officials responsible for the adjustment of the individual September

---

[10]     Because of the national and international impact of the September 11th Attack, not all insured losses occurred at the World Trade Center site in Lower Manhattan, such that steps such as this were indeed feasible and necessary for certain losses.

11th claims, including the particulars of the adjustment and payments for claims submitted by policyholders and insureds.[11]

As attested in the Movants' affidavits, the management and supervisory personnel who reviewed and audited the adjustments of the September 11th claims generally have expertise in a wide range of areas, including expertise in the calculation and determination of loss of business income, property values, and construction costs and expenses. As a general rule, management and supervisory personnel are all highly trained in their particular areas of specialty, and each individual brings to the claims evaluation process many years of experience. Finally, the adjustment process is also subject to industry standards of compliance and the fair claims handling statutes and laws of the applicable jurisdiction.

While the September 11th Attack caused death, injury and physical destruction on a scale never before experienced in this country, the processes employed by Movants' in adjusting the insurance claims arising from that event were well suited to meet the unique challenges and circumstances of that tragedy. The processes and procedures followed in the adjustment of the September 11th claims were developed over many decades, through Movants' experiences in responding to numerous catastrophic losses such as floods, hurricanes, wildfires, and earthquakes. Those processes and procedures have been further honed and refined through several decades of the adjustment of claims in the more routine context.

As a result, Movants' were well prepared to respond to the devastation caused by the September 11th Attack. As the RAND Corporation observed in a 2004 monograph entitled Compensation for Losses from the 9/11 Attacks, "Insurers were able to mobilize hundreds of adjusters to evaluate and process claims after 9/11. Many of those we interviewed praised the

---

[11]     Management regularly rely upon financial data and records related to the adjustment of claims and payment for these claims, including executive summaries of claims in process, identification of issues which arise in the adjustment of claims which require resolution, and other data which allows the adjuster to determine the accuracy of the claims adjustment process.

insurance industry's quick response to the claims … Without the huge insurance payments, the economic disruption caused by the Attack on the WTC would have been much greater. Greater demands for assistance would have been placed on government and charities, and a greater portion of the losses likely would have been borne by businesses and their workers." [12]

As the above summary of the evidence presented in the affidavits of Movants' officers and representatives demonstrates, Movants followed established industry standards and processes in the adjustment of the September 11th claims, and analyzed claims under established and recognized standards of proof. For these reasons, the processes implemented and followed by Movants resulted in total claim payments upon which this Court can rely in fairly and properly assessing damages against the defaulted defendants under the ATA.

3.    The Categories of Monetary Losses

The monetary expenses and losses for which Movants here seek an assessment of damages against the defaulted defendants under the ATA fall into three broad categories: claim indemnity payments, claim adjustment expenses, and claim legal expenses. A review of each category is in order.

a)    Claim Indemnity Payments

The total of the claim indemnity payments by the Movants reflect the scope and tragedy of the September 11th Attack, since "behind these numbers" of almost incomprehensible dimension are the persons, businesses and companies that suffered the significant and devastating losses. The claims which make up the total of the claim indemnity payments were subject to the adjustment processes and procedures described within the affidavits. The schedules of the total claim payments included as exhibits to the affidavits lists each separate

---

[12]    Lloyd Dixon and Rachel Kaganoff Stern, <u>Compensation for Losses from the 9/11 Attacks</u> at 22 (RAND Institute for Civil Justice 2004), available online at http://www.rand.org/pubs/monographs/2004/RAND_MG264.pdf .

insured, claim number, loss location, individual claim paid, and (where applicable) the claim adjustment and legal expenses incurred by the Movants. A review of some of the individual claims listed on these schedules reveals the entire gamut of the scope of the losses sustained by the Movants' insureds in this matter.[13]

The individual claims predominately arose in and around lower Manhattan at the former site of the World Trade Center towers. The claims include payments for the loss of personal property items, the loss of business personal property, the loss of income, and other business interruption losses as a result of the September 11th Attack. The claims paid by Movants range from losses in the hundreds of dollars suffered by insured individuals to losses in the multi-millions of dollars suffered by some of the largest and best known companies in the United States.

The affidavits establish that the claims of insured individuals or companies were considered pursuant to the adjustment processes as further described within these affidavits. The result is the total of the claim payments as of this date and noted within the claim schedules included as exhibits to the filed affidavits.

b) <u>Claim Adjustment And Claim Legal Expenses</u>

The response of the insurance industry to the catastrophic event of the September 11th Attack involved an unprecedented marshaling of resources in order to quickly, fully, and fairly respond to the claims submitted by Plaintiffs' policyholders for their damages and losses. The expenses incurred because of the commitment of these resources included the fees charged by outside consultants who were retained in order to accurately access the scope of the damages,

---

[13]     Pursuant to this Court's Order dated May 9, 2005, the schedules themselves are being filed under seal to protect the identity of the insureds from public disclosure. A copy of the Order is attached to the Carter Affirmation as Exhibit H.

and assist with the prompt conclusion of the adjustment of the claims.[14] As noted within the affidavits filed herewith, these expenses represent the fees charged by accountants and engineers who were utilized to ensure the accuracy of the claims submitted and losses sustained. Additionally, Movants retained construction consultants and other professionals with expertise in the areas necessary to evaluate the claimed casualty losses. Movants also paid the expenses incurred by adjustment professionals in responding to the extraordinary demands of the claims submitted following the September 11th Attack.

The Plaintiffs are entitled to recover these actual monetary expenditures as losses pursuant to the ATA, since these expenditures also represent injuries to Movants' business and property compensable under the provisions of that statute. For this same reason, the losses represented by the expenses incurred to retain legal counsel to advise and assist in the proper and fair adjustment of the claims submitted under Movants' policies of insurance are likewise compensable under the ATA statutory scheme.

## IV.    CONCLUSION

Based on the affidavits, Movants are entitled to the assessment of damages against these defendants, jointly and severally, as follows:

---

[14]     In an effort to simplify the issues presently before the Court and promote judicial efficiency in the resolution of the claims against the defaulted defendants, Movants are limiting the damages sought for their business and property damage claims against the defaulted defendants to the money paid to their insureds for business and property losses, and expenses directly associated with the adjustment of those business and property damage claims. However, those expenditures do not represent all of Movants' monetary losses as a result of the September 11th Attack. For instance, Movants incurred significant internal expenses in evaluating their obligations under the applicable polices of insurance. Movants reserve their right to seek recovery of such additional monetary losses in relation to the claims asserted against the defendants who are not subject to this Motion.

|  | Total Expended To-Date | Amount Trebled |
|---|---|---|
| AXA | $ 539,784,217.34 | $1,619,352,652.02 |
| Chubb | $2,248,047,793.41 | $6,744,143,380.23 |
| Munich Re | $ 108,341,198.07 | $ 325,023,594.21 |
| OneBeacon | $ 185,805,247.79 | $ 557,415,743.33 |
| TIG | $ 78,609,612.94 | $ 235,828,838.82 |
| **Totals:** | **$3,160,588,069.55** | **$9,481,764,208.61** |

For these reasons, the Movants request that the Court declare that the ATA is the standard for assessing damages against the defaulted defendants, that said damages can be established pursuant to the affidavits and evidence filed herewith, and that the Plaintiffs be awarded the total sum of $9,481,764,208.61 (the total of the claim indemnity payments, claim adjustment expenses, and claim legal expenses, trebled) in damages against defaulted defendants.[15]

Respectfully submitted,

COZEN O'CONNOR

Dated: February 13, 2007

BY: _____ /s/ _____
Stephen A. Cozen, Esquire
Elliott R. Feldman, Esquire
Sean P. Carter, Esquire
Adam C. Bonin, Esquire
1900 Market Street
Philadelphia, PA 19103
Tele: (215) 665-2000
Fax: (215) 665-2013

Attorneys for *Federal Insurance* Plaintiffs

PHILADELPHIA\2975268\2 117430.000

---

[15] Upon an order setting the amount of damages assessed based upon these claims, Plaintiffs will move to amend the order based to reflect the interest accrued based on that amount to-date.