UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

IN RE:                                         :        <u>MEMORANDUM DECISION</u>
                                               :        <u>AND ORDER</u>
TERRORIST ATTACKS ON                           :
SEPTEMBER 11, 2001                             :        03 MDL 1570 (GBD) (SN)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

This document relates to:

> *Federal Insurance Co., et al. v. Al Qaida, et al.*, No. 03-cv-06978
> *Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-09849
> *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-01923
> *Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04-cv-05970
> *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, No. 04-cv-07065
> *Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-07279

GEORGE B. DANIELS, United States District Judge:

For the past two decades, Plaintiffs have sought to hold a litany of defendants accountable

for losses incurred in the terrorist attacks of September 11, 2001 ("9/11 Attacks"). Many of these

defendants allegedly harbored, financed, aided, abetted, or materially supported al Qaeda. It is

alleged that Dubai Islamic Bank ("DIB" or the "Bank") is one such defendant. Plaintiffs assert

that DIB laundered money for Osama bin Laden and his terrorist network in the years leading up

to the 9/11 Attacks. DIB has consistently denied these allegations as well as this Court's authority

to exercise jurisdiction over the Bank. In 2010, this Court rejected DIB's motion to dismiss for

lack of personal jurisdiction and held that Plaintiffs had presented sufficient allegations to justify

exercising personal jurisdiction over DIB. *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp.

2d 456, 489 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*"), *rev'd in part on other grounds*, 714 F.3d

659 (2d Cir. 2013) ("*Terrorist Attacks VII*").

Now, after the completion of merits discovery, DIB argues that the facts do not support

Plaintiffs' original allegations and instead demonstrate that this Court lacks personal jurisdiction

over DIB. (Def.'s Mot. Summ. J., ECF No. 8126.)[1]  DIB seeks summary judgment on the grounds that there is no evidence that DIB purposefully directed its conduct at the United States or that DIB's U.S.-linked conduct related to Plaintiffs' 9/11 claims.  Plaintiffs counter that DIB's links to al Qaeda prove that it targeted the United States and, consistent with due process, Plaintiffs can thus seek redress for the tremendous damages they suffered on 9/11.  "'[N]o matter how horrendous the underlying attacks or morally compelling . . . [P]laintiffs' claims' are, this Court cannot exercise jurisdiction 'beyond the limits prescribed by the due process clause of the Constitution[.]'"  *In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 3d 416, 426 (S.D.N.Y. 2018) ("*Terrorist Attacks IX*") (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 344 (2d Cir. 2016)), *rev'd on other grounds sub nom. Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66 (2d Cir. 2019) ("*ARB*").  Considering the factual averments of the parties and the limits of due process, this Court GRANTS DIB's motion for summary judgment.

## I.     BACKGROUND[2]

### A.  Procedural History

In 2010, this Court evaluated its jurisdiction over DIB, denying DIB's first motion to dismiss for lack of personal jurisdiction. *Terrorist Attacks IV*, 718 F. Supp. 2d at 495.  Jurisdiction over DIB appeared consistent with due process because the Plaintiff's factual allegations, if true, showed that DIB had "the requisite minimal contacts" such that subjecting DIB to suit "would not

---

[1] Unless otherwise indicated, all docket numbers refer to the main docket sheet for this multidistrict litigation, *i.e.*, No. 03-md-1570.

[2] This Court assumes familiarity with the general background of this case and will only restate relevant factual background as necessary to address DIB's motion.

be unreasonable." *Id.* at 490.  This Court premised its minimum-contacts analysis on Plaintiffs'

allegations that:

- "[I]n 1999, the United States government announced that DIB was laundering money for Osama bin Laden";

- "United States officials visited the United Arab Emirates to put a halt to such a relationship";

- DIB "disregard[ed] the warnings," "refus[ed] to adhere to even minimal banking industry standards," and "continued to knowingly provide financial and other forms of material aid to Osama bin Laden and al Qaeda"; and

- Bin Laden's "Chief Financial Officer," Mustafa Ahmed al-Hawsawi, transferred "thousands of dollars . . . from DIB to two of the hijackers," who used the money for "training, including flight lessons, and other expenses incurred in preparing for the 9/11 terrorist attacks."

*Id.* at 488–89.

Plaintiffs thus alleged a direct line between DIB, support for al Qaeda, and the 9/11 Attacks.

They further asserted that DIB "intentional[ly], knowing[ly,] and direct[ly] . . . provid[ed] money

laundering services to al Qaeda" "in aid of al Qaeda's plan to commit an aggressive terrorist strike

against the United States." *Id.* at 489.  Therefore, it could be inferred that DIB "purposefully

directed its activity at the United States and its residents," creating the minimum contacts necessary

to exercise personal jurisdiction. *Id.* at 489–90.

In the intervening thirteen years, the parties completed merits discovery.  Last year, the

Central Intelligence Agency ("CIA") declassified intelligence reports previously withheld from

the parties during discovery.  The declassified materials include reports written both before and

after the 9/11 Attacks and reference DIB and its former Chairman Saeed Ahmed Lootah.

3

## B. Factual Evidence[3]

### 1. DIB's Structure and Organization

DIB is a "publicly traded banking company organized under the laws of the United Arab Emirates" ("UAE"). (Pls.' Resp. Def.'s Rule 56.1 Statement, ECF No. 8316, ¶ 1.)   It is headquartered in and operates its business from Dubai.   (*Id.* ¶¶ 2, 3.)   Other than keeping "correspondent banking accounts," DIB does not conduct business or provide services in the United States, nor has it sought qualifications to do so. (*Id.* ¶¶ 4–6.)  It has eight foreign branches but none in the United States. (*See* Def.'s Resp. Pls.' Rule 56.1 Counterstatement, ECF No. 8533-1, ¶ 87.)

DIB's largest shareholder is the Dubai Government, followed by the Government of Kuwait and the Board of Directors of DIB.   (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 88; *see* Dr. Hussein Hamid Hassan Aug. 1, 2017 Dep., ECF No. 8317-32, at 59:18–60:7 (estimating the UAE Government's stake at approximately 30%).)  The Board of Directors manages DIB and appoints members of its Fatwa and Shariah Supervisory Board, which, at the request of the Bank, evaluates investments to determine whether they comport with Islamic laws. (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 147; *see* Hassan Aug. 3, 2017 Dep., ECF No. 8317-33, at 292:10–25, 293:13–294:6.)  Lootah sat on the Board of Directors along with other members of his family and served as DIB's chairman until at least 1998.   (*See* Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 88.)

---

[3] In accordance with Magistrate Judge Sarah Netburn's order striking the Supplementary Expert Report of Jonathan M. Winer as untimely, (ECF No. 8905 (striking report at ECF No. 8345-1), this Court has not considered the portions of the Rule 56.1 statements supported solely by Winer's testimony.

## 2.  Al Qaeda's Mission

Between 1992 and 1998, al Qaeda publicly called for jihad against the United States. (*Id.* ¶¶ 161–67.)  In 1996, Khalid Sheikh Mohammed presented Osama bin Laden with the idea of attacking the United States using hijacked planes. (*Id.* ¶ 165.)  Bin Laden approved the 9/11 plot in "late 1998 or early 1999." (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 34.)  Al Qaeda attacked U.S. interests abroad beginning in 1998, when it bombed the U.S. Embassies in Kenya and Tanzania. (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 167.)  Three years later, members of al Qaeda carried out the 9/11 Attacks.

## 3.  Pre-9/11 Activities

In 1998, DIB discovered a fraud against the Bank unrelated to al Qaeda or terrorism. (Pls.' Resp. Def.'s Rule 56.1 Statement ¶¶ 19, 23.)  In response, the Bank hired an investigator and the Dubai Government intervened to alter the Bank's management structure. (*Id.* ¶ 19.)  With the input of the government, DIB appointed a new board of directors in early 1999. (*Id.* ¶¶ 20–21.)  The then-UAE Minister of Financial Affairs and Industry Mohammed Khalfan bin Kharbash became DIB's new chairman. (*Id.* ¶ 21.)

In July 1999, the *New York Times* published an article that "described a diplomatic mission from the U.S. to the [UAE] 'to lobby for a halt to a suspected financial relationship between a Government-controlled bank and Osama bin Laden.'" (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 125 (quoting James Risen & Benjamin Weiser, *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations*, N.Y. TIMES, Jul. 8, 1999, ECF No. 8317-22, at 1).)  The article alleged that the CIA had evidence bin Laden had "funnel[led] money through" DIB with the "approval" of officials at the Bank, "which the [UAE] Government effectively control[led]." (*Id.* ¶ 126 (quoting Risen & Weiser, *U.S. Officials Say Aid for Terrorists Came Through Two Persian Gulf Nations* at 1–2).)  U.S. State Department spokesperson James Foley

faced questions about the article's contents.  (*Id.* ¶ 127.)  Foley "confirmed that the U.S. government was working with the [UAE] to strengthen cooperation against terrorism, including terrorist finance, and was told by the UAE government that the Dubai Emirati government 'ha[d] taken steps to clean up the bank, the Dubai Islamic Bank, and to restore its reputation.'"  (*Id.* (quoting *State Department Regular Briefing*, FED. NEWS SERV., Jul. 8, 1999, ECF No. 8317-24, at 2).)

In response, DIB instructed outside counsel based in the United States, the Honorable Alan Fine, who was then in private practice, to seek additional information about the article's allegations.  (Pls.' Resp. Def.'s Rule 56.1 Statement ¶¶ 24–25.)  Fine offered "DIB's full cooperation" and asked the State Department for information that would help DIB investigate "any suspected relationship" with bin Laden.  (*Id.* ¶ 25.)  The State Department told Fine that DIB "wouldn't find anything in the name of Osama bin Laden"—that the activity "was either in domestic wire transfers or withdrawals from accounts, through other names," (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 177 (quoting Alan Fine Oct. 4, 2019 Dep. 25:7–12))—and gave him "no names, dates, or account numbers to search," (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 26). Rob Ellison, a DIB consultant initially hired to investigate the fraud against the Bank, searched DIB's database for "any accounts, any transfers from, any transfers to Osama bin Laden" using a "variation of spellings."  (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶¶ 185–86.)  According to DIB, its searches produced no accounts held in bin Laden's name.  (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 11.)

Fine wrote a letter to the *New York Times* stating, "DIB has never dealt directly with Osada [sic] bin Laden, and had no knowledge or reason to believe that anyone acting on Bin Laden's behalf had been laundering his money through DIB."  (Def.'s Resp. Pls.' Rule 56.1

Counterstatement ¶¶ 178, 181.)  Fine further stated, "Taken as a whole, the article conveys the message that DIB knowingly assisted a terrorist in laundering money.  This message is utterly and completely false."  (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 179.)  DIB sent the letter seeking retraction, but the *New York Times* defended its story, citing Foley's statements.  (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 27; Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶¶ 181–83.)

Later that year, DIB distributed sanctions lists from the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") to each DIB office "where accounts could be opened or transactions could be conducted, to ensure that DIB did not conduct any business with any party named on those lists, which included al Qaeda, bin Laden's Islamic Army, the 'Usama Bin Laden Organization,' and the 'Usama Bin Laden Network.'"  (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 35.)  DIB also audited its account opening procedures, (*id.* ¶ 40), and, in 2001, appointed an Anti-Money Laundering Compliance Officer who "developed policies and procedures, prepared reports, provided training, and communicated with the [UAE] Central Bank," (*id.* ¶ 41).

### 4.  Post-9/11 Investigations

Through searches conducted pursuant to this litigation, DIB discovered ten "accountholders of interest" whose accounts were active before 9/11.  (*See id.* ¶ 48.)  These DIB accounts were held by Ali Abdul Aziz Ali, Fayez Rashid Ahmed Hassan Al Qadi, Ali Saleh Mohammad Kahla Al-Marri, Seedi Al Madani Al-Ghazi Mustafa Al Tayyib, Mamdoh Mahmoud Salim Ahmed, Khalid Amer Salim Ballayth, Ahmed Nur Ali Jumale, the Barakaat Bank of Somalia ("Barakaat Bank"), the Al Baraka Exchange LLC ("Al Baraka'), and the International Islamic Relief Organization ("IIRO").  (Pls.' Resp. Def.'s Rule 56.1 Statement at 22 n.2.)  Relevant details of these DIB accountholders are as follows:

- Aziz Ali is Khalid Sheikh Mohammed's nephew.  (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 130.)  According to the 9/11 Commission, Aziz Ali and al-

Hawsawi helped the hijackers finance their operation and travel through the UAE in 2001. (*Id.* ¶ 131.) Aziz Ali opened an account at DIB in August 2000 and withdrew "nearly all the money" from it on September 10, 2001, before he fled from Dubai to Karachi, Pakistan. (*Id.* ¶¶ 130, 132.) Al-Hawsawi never held an account at DIB. (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 14.)

- Qadi was one of the 9/11 hijackers. (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 138.) He ceased using his DIB account over a year before 9/11. (*Id.*)

- Al Marri attended al Qaeda terrorist training camps and "was instructed by 9/11 mastermind Khalid Sheikh Mohammed 'to enter the United States no later than September 10, 2001.'" (*Id.* ¶ 138.)

- Tayyib was a high-ranking member of al Qaeda "in charge of most of Osama bin Ladin's money" and had a "relationship" with Lootah. (*Id.* ¶ 107.) DIB bank statements from 1993 to 1995 show multiple instances in that time period in which Tayyib deposited and then withdrew amounts over $10,000 and in some cases over $100,000. (*Id.* ¶¶ 111–14.)

- Salim Ahmed was "a founding member of Al Qaeda responsible for managing terrorist training camps in Afghanistan and Pakistan and attempting to obtain nuclear weapons for the terror group." (*Id.* ¶ 133.) When he was arrested for his role in the 1998 U.S. embassy bombings, German authorities found "multiple cards related to DIB accounts in his name." (*Id.*)

- Salim Ballayth was an associate of bin Laden and had an account at DIB in the years before 9/11. (*Id.* ¶ 135.)

- Jumale, the man behind the Barakaat Bank and Al Baraka, used his network of companies to "'transmit funds, intelligence and instructions' to al Qaeda and associated terror groups." (*Id.* ¶ 136 (citation omitted).) After 9/11, Jumale was labeled a Specially Designated Global Terrorist subject to OFAC sanctions, and the UAE seized his personal and business accounts at DIB. (*Id.*)

- IIRO was a front charity for al Qaeda and helped establish the "Chechen Refugee Assistance Fund" at DIB. (*Id.* ¶ 137.)

None of these accountholders appeared on pre-9/11 OFAC lists.[4] (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 49.) Plaintiffs present no evidence that individuals or entities used money from these DIB accounts to fund al Qaeda or carry out 9/11. (*Id.* ¶¶ 52–66.) Indeed, Plaintiffs have no "evidence that funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks." (*Id.* ¶ 67.) According to DIB, the Bank was never sanctioned for money-laundering or terrorist-financing concerns before 9/11. (*Id.* ¶ 17.)

In addition to the ten accountholders, Plaintiffs identify a handful of other links between al Qaeda and DIB. In his book, bin Laden's spiritual advisor Abdullah Azzam directed readers to send monetary donations for the Afghan mujahideen to a DIB account.[5] (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 134.) Moreover, two members of the Shariah Board, Ali Muhyiddin al

---

[4] Plaintiffs argue this fact is irrelevant because OFAC's Specially Designated Global Terrorist list did not exist at the time. (*See* Pls.' Resp. to Def. R. 56.1 Statement ¶ 49.) Even before 9/11, however, individual terrorists—including bin Laden—were blacklisted as OFAC Specially Designated Terrorists. *See* Exec. Order No. 13,099, 63 Fed. Reg. 45167 (Aug. 20, 1998). Presumably, other members of al Qaeda could have been included on OFAC's Specially Designated Terrorists sanctions list but were not.

[5] At the time of the book's publication in 1984, the Afghan mujahideen were fighting Soviet Union troops that had invaded Afghanistan. In addition to calls for donations from Abdullah Azzam, funds and weapons to the Afghan mujahideen came from the CIA. *See, e.g.*, Steve Coll, *Anatomy of a Victory: CIA's Covert Afghan War*, WASH. POST, Jul. 19, 1992.

Qaradaghi and Dr. Ajeel Jaseem Nashmi, who began serving in the late 1990s and early 2000s, respectively, published articles in their individual capacities supportive of terrorist acts. (*Id.* ¶¶ 144–46.)

### 5. CIA Assessments

"[F]inished intelligence" reports from before and after the 9/11 Attacks capture the CIA's assessments of al Qaeda and its links to DIB. (*Id.* ¶ 78.) Bin Laden's organization, the reports explain, is a "pan-Islamic militant group established during the [Soviet-]Afghan war" whose "goal is to bring about the return of the Caliphate." (*Id.* ¶ 84(g) (quoting CIA_000735, ECF No. 8317-12).) Extremist organizations like al Qaeda are attracted to Islamic banks because "low-level bank employees . . . may turn a blind eye to money movements by extremist groups" and because "a general lack of local regulatory scrutiny . . . may offer additional confidence to extremists that their financial activities will not be closely examined." (*Id.* ¶ 84(c) (quoting CIA_000723–24).)

In the CIA's view as of November 1998, DIB was a "key financial conduit" for al Qaeda. (*Id.* ¶ 79 (quoting CIA_000337, ECF No. 8317-9).) "Bank Al Taqwa and [DIB] st[ood] out from other Islamic financial institutions because of their management's apparently witting involvement in the financial activities of . . . Usama Bin Ladin's Islamic Army" and other terrorist groups. (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 84(f) (quoting CIA_000728).) Further, DIB may have had financial ties to IICO, based on Sheikh Yousif Jassim Al Haji's position on the DIB Board, (*id.* ¶ 84(g) (quoting CIA_000737)), and Lootah was a member of the Muslim Brotherhood, (*id.* ¶ 84(b) (quoting CIA_000722)).

As of 1998, the CIA assessed that Lootah's "close friend[ship]" with bin Laden prompted Tayyib and other al Qaeda members to open accounts at DIB. (*Id.* ¶¶ 79–80, 84(g), 92 (citations omitted).) Lootah had "personally" authorized, stamped, and signed letters of credit for bin Laden associates, although the CIA noted that these acts may have constituted standard practice for letters

of credit of a certain value, like those issued to bin Laden's Sudan-based businesses. (*Id.* ¶¶ 79, 84(g) (citing CIA_000747; also citing CIA_000326).) Bin Laden's businesses "were used to fund al Qaeda operations, including the travel of extremists to Sudan for training and the funding of al Qaeda camps." (*Id.* ¶ 102.) While operating from Sudan, bin Laden "combined business with *jihad* under the umbrella of al Qaeda." (*Id.* ¶ 101 (citing CIA_000068).)

## II.    LEGAL STANDARD

A defendant is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), where the "undisputed facts demonstrat[e] the absence of jurisdiction," *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). A court has jurisdiction over a properly served defendant if: (1) there is a "statutory basis for personal jurisdiction"; and (2) "the exercise of personal jurisdiction . . . comport[s] with constitutional due process principles." *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 69 (2d Cir. 2022) (quoting *Waldman*, 835 F.3d at 327). The plaintiff bears the burden of demonstrating these conditions are met. *Ball*, 902 F.2d at 196. How a plaintiff must meet that burden "varies depending on the procedural posture of the litigation." *Id.* at 197.

To survive summary judgment, Plaintiffs must proffer "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Id.* "[A]llegations" are not enough. *Id.* Averments must be supported by "admissible evidence." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001); *cf. Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 251 (S.D.N.Y. 2020) (analogizing to 56(a) standard to hold that courts may consider only admissible evidence on post-jurisdictional-discovery 12(b)(2) motion).

### III.   THE CIA FILES ARE ADMISSIBLE

DIB argues that the declassified CIA documents on which Plaintiffs rely in Plaintiffs' averment of facts are inadmissible hearsay. (Def.'s Mem. Law Mot. Summ. J., ECF No. 8127, at 26–28.) As the moving party, DIB bears the burden of establishing their inadmissibility. *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000). DIB is unable to meet that burden.

Federal Rule of Evidence 803(8) provides a hearsay exception for government records that (1) set out "factual findings from a legally authorized investigation," if (2) "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." The declassified documents meet the first criterion because they consist of publicly available factual findings written pursuant to investigations authorized by the CIA. *See United States v. Gluk*, 831 F.3d 608, 614 (5th Cir. 2016) (noting that where an agency "transmits a document to others outside the agency, that document is presumptively a factual finding").

With respect to the second prong, the declassified CIA documents are trustworthy because (1) they represent timely investigations; (2) the CIA analysts and officials who drafted and approved the reports have special skills and experience in counterterrorism; (3) officials held hearings (at least by the 9/11 Commission) regarding the intelligence conveyed in the documents; and (4) the CIA authors display impartiality. *See Bridgeway Corp.*, 201 F.3d at 143 (identifying four factors relevant to trustworthiness).

Claims that the reports are based on unreliable, unfinished intelligence do not meet DIB's burden to demonstrate that the reports are untrustworthy because "raw intelligence" can indeed be reliable. *See Barhoumi v. Obama*, 609 F.3d 416, 429 (D.C. Cir. 2010) (noting that "raw" intelligence may be admissible where it is "presented in a form, or with sufficient additional information, that permits . . . [the] court to assess its reliability" (citation omitted)). Despite the redactions of the authors' names, the documents carry the imprimatur of the CIA, which largely

12

cures any reliability concerns posed by the redactions. To find otherwise would render inadmissible a host of national security documents whose age or lack of continued sensitivity qualifies them for declassification but whose authors remain in need of anonymity. The necessity for such redactions is perhaps nowhere greater than in America's foreign intelligence service, particularly in the realm of counterterrorism. *Cf. United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) ("Given the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon."). Here, there is no suggestion that the CIA repudiated the documents or the intelligence they contained, thereby mitigating any trustworthiness concerns and placing the documents squarely within the hearsay exception for public records. This Court therefore admits the CIA files for the limited purposes of this motion.

## IV. MERITS DISCOVERY HAS DEMONSTRATED THAT THIS COURT LACKS PERSONAL JURISDICTION OVER DIB

This Court now turns to: (1) whether the law of the case doctrine requires this Court to follow its 2010 decision denying DIB's motion to dismiss for lack of personal jurisdiction; (2) whether this Court has a statutory basis for such jurisdiction; and (3) whether exercising personal jurisdiction over DIB comports with due process.

### A. Law of the Case Does Not Restrict This Court's Decision on Summary Judgment

The law of the case doctrine dictates that decisions made at one stage of litigation should "generally" apply at subsequent stages. *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (quoting *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991)). However, the doctrine "cannot bar a district court from holding plaintiffs to their ever-increasing burden of proof over the course of a lawsuit." *Cangemi v. United States*, 13 F.4th 115, 140 (2d Cir. 2021). A court may thus "revisit" a decision denying a motion to dismiss, which is based "only on the plaintiff's

allegations," when it decides a motion for summary judgment, which is "based on undisputed evidence." *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013).

Jurisdictional issues are no exception to this rule. In *Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637 (S.D.N.Y. 2015), the district court explained that, even though it had previously determined that the plaintiff "adequately alleged jurisdiction so as to survive a Rule 12(b) motion," when "asked to determine whether any dispute of material fact exists regarding [its] jurisdiction," it "must undertake renewed examination" of the issue, *id.* at 647. Here, this Court denied DIB's motion to dismiss for lack of personal jurisdiction because Plaintiffs' allegations, *if true*, would give it jurisdiction over DIB. After years of discovery, DIB now argues that the facts do not bear out Plaintiffs' allegations. If DIB is correct, the claims against it cannot survive summary judgment, notwithstanding the Court's prior decision denying its motion to dismiss. *See Cangemi*, 13 F.4th at 140.

Nonetheless, this Court will not disturb the *legal* reasoning of its prior order "absen[t] . . . extraordinary circumstances," such as an intervening change in law. *N. River. Ins. Co. v. Phila. Reinsurance Corp.*, 63 F.3d 160, 165 (2d Cir. 1995) (quotation marks and citation omitted) (explaining when courts should adhere to law of the case); *see also Nobel Ins. Co. v. City of New York*, No. 00-cv-01328 (KMK), 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) ("To the extent [the court's prior] legal conclusions . . . are not in any way altered by discovery, or by subsequent developments in the law, this Court will not here reconsider those prior rulings.").

## B. Statutory Basis for Personal Jurisdiction over a Defendant

Plaintiffs suggest two statutory bases for jurisdiction: New York's long-arm statute, N.Y. Civil Practice Law and Rules ("CPLR") § 302, and Federal Rule of Civil Procedure 4(k)(2). They omit a third, the District of Columbia's analogous long-arm statute, D.C. Code § 13-423. The relevance of D.C.C. § 13-423 is a quirk of multidistrict litigation ("MDL") law. Congress

authorized the federal courts' Joint Panel on Multidistrict Litigation to "transfer[]" and "consolidate[]" civil cases pending in different districts and "involving one or more common questions of fact" to a single court. 28 U.S.C. § 1407. When courts transfer a case pursuant to § 1407, "the transferee judge has all the jurisdiction . . . in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 163 (2d Cir. 1987) (quoting *In re FMC Corp. Patent Litig.*, 422 F. Supp. 1163, 1165 (J.P.M.D.L. 1976)). Thus, "the relevant forum for jurisdictional purposes" is the one where the action was "initiated," not the one where the consolidated proceedings are held. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 n.4 (2d Cir. 2018) ("*Schwab*").

The parties originally filed five of the six actions at issue in New York ("the New York cases").[6] As to these five actions, the parties are correct that this Court's statutory basis for jurisdiction must come from either New York law or Rule 4(k)(2). *See id.* However, Plaintiffs filed one of the actions at issue in the District of Columbia. *Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 03-cv-09849, at ECF No. 9 (transferring case from D.D.C. to S.D.N.Y.) ("*Burnett*"). This Court's statutory basis for jurisdiction over that action therefore depends upon District of Columbia law or Rule 4(k)(2). Accordingly, if *Burnett* and the New York cases meet the nuanced requirements of the District of Columbia and New York's long-arm statutes, respectively, then those forum laws provide a statutory basis for jurisdiction over DIB.

If *Burnett* and the New York cases fail their respective requirements of the District of Columbia or New York's long-arm statutes, Rule 4(k)(2) provides an alternative statutory basis

---

[6] *See Federal Insurance Co., et al. v. Al Qaida, et al.*, No. 03-cv-06978, at ECF No. 1; *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-01923, at ECF No. 1; *Continental Casualty Co., et al. v. Al Qaeda, et al.*, No. 04-cv-05970, at ECF No. 1; *Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, No. 04-cv-07065, at ECF No. 1; *Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, No. 04-cv-07279, at ECF No. 1.

for jurisdiction over DIB. Rule 4(k)(2) authorizes a federal court to exercise jurisdiction over a properly served defendant if: (1) the claims against it arise under a federal law that authorizes service of process, (2) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," and (3) the exercise of jurisdiction is consistent with the Constitution and federal law. The first criterion is plainly satisfied. The claims against DIB arise largely under the Anti-Terrorism Act ("ATA"), a federal statute that incorporates nationwide service of process.[7] 18 U.S.C. § 2334(a). The second criterion is conditionally met. Assuming DIB is not subject to jurisdiction in the District of Columbia and New York, "[t]here is also nothing in the record to suggest that [it would be] subject to the general jurisdiction of any [other] [s]tate." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2015 WL 6472656, at *6 (S.D.N.Y. Oct. 23, 2015). And "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *Mwani v. bin Laden*, 417 F.3d 1, 12 (D.C. Cir. 2005) (quoting *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004)).[8] DIB does not point to any forum in which it could be sued, so this Court is confident that no forum besides New York or the District of Columbia poses a barrier to Rule 4(k)(2) jurisdiction.

---

[7] This Court addressed and resolved DIB's previous service of process arguments in Plaintiffs' favor. *Terrorist Attacks IV*, 718 F. Supp. 2d at 490–91 (denying DIB's motion to dismiss for insufficient service under Fed. R. Civ. P. 12(b)(5)).

[8] Although the Second Circuit has not yet adopted this principle from *Mwani*, its logic is compelling, and it relieves this Court of the tedious task of analyzing a defendant's contacts under each state's long-arm statute. *See Torbana Corp. v. M/V "SUMMER MEADOWS,"* No. 03-cv-02099 (HB), 2003 WL 22852742, at *5 (S.D.N.Y. Dec. 2, 2003) (finding that Rule 4(k)(2)'s second prong was met where defendant "conceded that it [was] not subject to jurisdiction in any state"); *but see Porina v. Marward Shipping Co.*, No. 05-cv-05621 (RPP), 2006 WL 2465819, at *3–4 (S.D.N.Y. Aug. 24, 2006) (declining to adopt *Mwani*'s approach and instead applying the First Circuit's burden-shifting framework for prong two).

## C. Due Process Analysis for Personal Jurisdiction

Regardless which statutory basis provides for personal jurisdiction, a court must determine whether jurisdiction is consistent with the due process requirements of the Fifth and Fourteenth Amendments.[9]  Jurisdiction is consistent with due process only if the defendant has "contacts" with the forum such that "maintenance of the suit" is "reasonable" and "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945) (quotation marks and citation omitted).  The due process analysis is the same regardless of the statutory basis for jurisdiction—whether Rule 4(k)(2) or a long-arm statute—with one caveat: if Rule 4(k)(2) provides the statutory basis for jurisdiction, the due process analysis turns on the defendant's contacts with the United States *as a whole*.  *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 319 (S.D.N.Y. 2020), *rev'd in part on other grounds*, No. 20-1458, 2023 WL 2229364 (2d Cir. Feb. 27, 2023).  If a long-arm statute provides the basis for jurisdiction, a court considers only contacts with the *forum*. *Id.*  Here, that distinction is immaterial: DIB's alleged contacts with the United States *are* its contacts with New York (or, in the case of *Burnett*, the District of Columbia).[10]  Thus, if the Constitution poses no barrier to this Court's jurisdiction over DIB, then a statutory basis—either Rule 4(k)(2) or state statute—exists for jurisdiction.

When analyzing the authority to exercise personal jurisdiction over a defendant, courts distinguish between general and specific jurisdiction.  General jurisdiction applies to defendants

---

[9] The exercise of jurisdiction must satisfy the due process requirements of the Fourteenth Amendment where the basis is a state's long-arm statute and the Fifth Amendment where the basis is Federal Rule 4(k). "[T]he due process analysis is basically the same under both the Fifth and Fourteenth Amendments. The principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." *Terrorist Attacks IV*, 718 F. Supp. 2d at 469 (quoting *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998)).

[10] For simplicity, this Court refers to DIB's contacts as "contacts with the United States" in the due process section of this opinion.

that are "essentially at home" in the forum, through incorporation or their principal place of business, and "extends to 'any and all claims' brought against a defendant." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014). Incorporated and headquartered in the United Arab Emirates, DIB is not "at home" in the United States, so this Court must determine whether specific jurisdiction applies to DIB. (*See* Pls.' Resp. Def.'s Rule 56.1 Statement ¶¶ 1–6 (statements on DIB's incorporation, its headquarters, and geographic scope of its business).)

Specific jurisdiction "covers defendants less intimately connected with" the forum. *Ford Motor Co.*, 141 S. Ct. at 1024. To determine the existence of specific jurisdiction, the Court must decide (1) whether "the assertion of personal jurisdiction would comport with fair play and substantial justice," *i.e.*, whether the assertion would be "reasonable[]" under the circumstances and (2) whether the suit arises from the defendant's certain "minimum contacts" with the forum. *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171, 173 (2d Cir. 2013). While courts analyze minimum contacts generally as the initial step in the specific jurisdiction analysis, this Court here turns to reasonableness first for clarity in this opinion.

### 1. Reasonableness Prong for Specific Jurisdiction

This Court must find that exercising jurisdiction "would be reasonable under the circumstances of the particular case." *Terrorist Attacks IV*, 718 F. Supp. 2d at 469 (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)). At this stage, courts consider: (1) "the burden on the defendant"; (2) "the interests of the forum"; (3) "the plaintiff's interest in obtaining relief"; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies"; and (5) "the shared interest of the several [s]tates in furthering fundamental substantive social policies." *Asahi*, 480 U.S. at 113 (quoting *World-Wide*

18

*Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)); *accord Metro. Life*, 84 F.3d at 568. Plaintiffs assert that exercising jurisdiction is reasonable given the strong interests of the forum, the plaintiffs, and the justice system as a whole.

On balance, the factors would counsel that exercising jurisdiction over DIB is reasonable. First, the "burden" on DIB, though perhaps heavy, is not an unreasonable one, as it has participated in this litigation for years and is ably represented by U.S.-based counsel. Second, the United States has a strong interest in "providing its residents with a convenient forum for redressing injuries inflicted by" international actors. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985); *see also* JASTA, Pub. L. No. 114-222, 130 Stat. 852 ("[t]he United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States . . . ."). Third, Plaintiffs have a strong interest because their witnesses and evidence are primarily within the United States and the U.S. court system is likely the only venue that could hear their claims. Fourth and fifth, both efficiency and anti-terrorism policies favor hearing Plaintiffs' claims in the United States, which is the locus of all harm incurred in the 9/11 Attacks.

In certain circumstances, these factors may indeed "establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Burger King*, 471 U.S. at 477. According to Plaintiffs, the strength of these interests overcomes any deficiencies in DIB's minimum contacts. (*See* Pls.' Mem. Law Opp'n Mot. Summ. J., ECF No. 8315, at 26–28.) But *Burger King* does not give this Court carte blanche to ignore a defendant's lack of contacts, *see Terrorist Attacks VII*, 714 F.3d at 674, and the marginal latitude it does grant does not warrant upending this Court's minimum-contacts analysis.

### 2. *Minimum Contacts Prong for Specific Jurisdiction*

Even if this Court finds that exercising jurisdiction "would be reasonable under the circumstances of the particular case," a defendant must have "the requisite minimal contacts" with

the forum. *Terrorist Attacks IV*, 718 F. Supp. 2d at 469 (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). The Court of Appeals for the Second Circuit recognizes various "independent, if conceptually overlapping, methods of demonstrating minimum contacts." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007). Typically, these methods rely on a defendant's in-forum contacts, but in certain circumstances, courts find the requisite contacts even where a defendant acts entirely outside the forum. Plaintiffs advance two such minimum-contacts theories here. First, they argue that DIB satisfies the "purposeful direction" (or "effects test"), a "theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci ex rel. Licci*, 732 F.3d at 173. Second, Plaintiffs assert a conspiracy (or "concerted action") theory of jurisdiction attributing al Qaeda's in-forum contacts to DIB.

> ### a. The "purposeful direction" or "effects test" fails to satisfy minimum contacts by DIB.

Under the "purposeful direction" or "effects test," due process is satisfied if Plaintiffs' injuries arose from DIB's "intentional, and allegedly tortious, actions . . . expressly aimed" at the United States. *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93, 95 (2d Cir. 2008) ("*Terrorist Attacks III*") (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)); *accord Terrorist Attacks VII*, 714 F.3d at 674. Here, the test requires showing both intent and a nexus between DIB and al Qaeda.

Beginning with intent, DIB must have "specific[ally] inten[ded] . . . to aid al Qaeda in the commission of a terrorist attack against the United States and its citizens." *Terrorist Attacks IV*, 718 F. Supp. 2d at 487. To that end, DIB must have known that "the brunt of the injuries [stemming from its support of al Qaeda would] be felt" on American soil. *Id.* at 480. "[T]he mere

'fact that harm in the [United States was] foreseeable'" is insufficient to establish jurisdiction. *Waldman*, 835 F.3d at 339 (quoting *Terrorist Attacks VII*, 714 F.3d at 674).

Allegations satisfying the aiding-and-abetting standard under the ATA, as amended by Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016), can give rise to an inference of the defendant bank's own "intent to further [the organization's] terrorist activities." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 330 (2d Cir. 2018). However, "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*. Aiding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activity." *Id.* at 329 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). More specifically, "[DIB] must [have been] 'generally aware' that it was thereby playing a 'role' in [al Qaeda's] violent or life-endangering activities." *Id.* (quoting *Halberstam*, 705 F.2d at 477); *see also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) ("If the defendant knowingly— and not innocently or inadvertently—gave assistance, directly or indirectly, and if that assistance was substantial, then aiding and abetting is sufficiently established if the defendant was '*generally* aware' that it was playing a role in international terrorism."). In assessing DIB's mental state, this Court must evaluate the facts of record "in the context of the enterprise they aided." *Kaplan*, 999 F.3d at 865 (quoting *Halberstam*, 705 F.2d at 488).

Turning to nexus, the Bank's support of al Qaeda must have a "reasonable . . . temporal, geographical or causal connection, or proximity to the 9/11 attacks."[11] *Terrorist Attacks IV*, 718

---

[11] In *Kaplan*, the Second Circuit recognized that "[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind." 999 F.3d at 857 (citation omitted). However, even applying this standard when assessing nexus for personal jurisdiction, the averment of facts fails to demonstrate DIB aided or abetted either al Qaeda or the 9/11 Attacks in its provision of banking services prior to 9/11.

F. Supp. 2d at 482. Relevant factors include "what support was given" and "when," "how the[]
defendants were involved in … providing support to" al Qaeda, and whether funding was
"'earmarked' for use in specific schemes or attacks not directed at the United States." *ARB*, 779
F. App'x at 69 (quoting *Terrorist Attacks VII*, 714 F.3d at 678–79). Conduct that is "too remote
and attenuated" cannot support jurisdiction. *Terrorist Attacks IV*, 718 F. Supp. at 486–87; *see also
ARB*, 779 F. App'x at 69 (granting jurisdictional discovery as to ARB because its support was
"more direct" than that of other defendants). The terrorist organization that the defendant bank
allegedly aided and abetted must be "known to be targeting the United States." *Waldman*, 835
F.3d at 340.

The courts have applied these principles in this MDL to a range of defendants,[12] including
the "Four Princes." *Terrorist Attacks III*, 538 F.3d at 94. The Four Princes defendants "supported
Muslim charities knowing that their money would be diverted to al Qaeda"—"an organization that
was openly hostile to the United States"—which "then used the money to finance" the 9/11
Attacks. *Id.* at 94–95. The Second Circuit deemed this conduct insufficient to sustain jurisdiction
over the defendants. *Id.* at 95. Observing that the Four Princes did not "direct[]" 9/11 or
"command[] an agent (or authorize[] al Qaeda) to commit" 9/11, the court concluded that
supporting al Qaeda's attacks through an intermediary was "far too attenuated" to establish
personal jurisdiction. *Id.* at 94–95. The court reached a similar conclusion as to several Sudanese
defendants. Those defendants "provided financial services" to individuals and charities associated
with al Qaeda and "knowingly maintained bank accounts" that were used to finance the terrorist
organization's operations. *Terrorist Attacks VII*, 714 F.3d at 676. This nexus, too, was
"insufficient for personal jurisdiction purposes." *Id.* at 677.

---

[12] *Linde* and *Kaplan* are the most recent developments since the issuance of the earlier MDL decisions.

This Court has arrived at analogous conclusions with respect to a conglomerate of banks—DMI Administrative Services S.A., Faisal Islamic Bank–Sudan ("FIBS"), Al Shamal Islamic Bank, and Tadamon Islamic Bank—in which bin Laden held shares. *Terrorist Attacks IV*, 718 F. Supp. 2d at 486–87. Bin Laden "invested millions" in Al Shamal, and the banks "helped al Qaeda to grow." *Id.* at 486. They "provided Osama bin Laden with funding, banking services[,] and the financial infrastructure" he needed to "establish al Qaeda training camps, train terrorists, and carry out terrorist attacks." *Id.* In their material support for the terrorist group, the banks "manag[ed] and h[eld] bank accounts [for] individuals and entities involved in al Qaeda's plot[s]," donated to "al Qaeda front charities," and became "substantially involved in other banks and organizations actively supporting al Qaeda." *Id.* Even these contacts were "too remote and attenuated." *Id.* at 486–87. This Court explained that "rendering support to al Qaeda during its formative years, performing routine banking services for customers having terrorist ties, and having investors or shareholders who purportedly are sponsors of terrorism" did not satisfy the effects test. *Id.* at 486.

DIB's conduct is no more intentional or direct than that of the banks this Court dismissed from this litigation. Like those banks, DIB held accounts for individuals and entities involved in al Qaeda plots and provided "routine banking services" for them. *Id.* DIB's onetime Chairman Lootah and two members of the Shariah Board harbored extremist views or maintained links to extremist groups. (*See* Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 84(b).) And certain individuals and entities affiliated with al Qaeda did hold accounts at DIB. (Pls.' Resp. Def.'s Rule 56.1 Statement at 22 n.2.) But there is no specific evidence that any of the accounts held by individuals or entities with links to al Qaeda provided funding for the terrorist organization's operations, let alone for the 9/11 Attacks. (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 67.) The most suspect transactions—withdrawal and deposits from Tayyib's account—occurred in the 1990s, a

period too remote to establish the requisite contacts. (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶¶ 111–14.); *see Terrorist Attacks VII*, 714 F.3d at 676 (affirming dismissal of claims against defendants because their support of al Qaeda in the early 1990s was not "connected in any meaningful way" to the 9/11 Attacks).

While DIB may have provided al Qaeda-linked accounts with routine banking services closer in time to the 9/11 Attacks than DMI, FIBS, Al Shamal, and Tadamon, it is not clear that DIB was operating with the same level of scienter as those banks. Those banks were intimately intertwined with al Qaeda; bin Laden himself was a shareholder and major investor in them. There is no evidence that DIB, on the other hand, was aware of the terrorist nature of the accountholders to whom it was providing routine banking services. According to the CIA, Lootah was aware of bin Laden's extremism and may have personally authorized letters of credit on behalf of businesses bin Laden owned, but there is no proof that Lootah's actions at DIB were anything more than standard bank policy. (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶¶ 79, 84(g).) Plaintiffs offer no other support for the CIA's description of DIB management's "apparently witting involvement" in financing al Qaeda. (Def.'s Resp. Pls.' Rule 56.1 Counterstatement ¶ 84(f) (quoting CIA_000728).) Indeed, testimony from DIB witnesses establishes that, when confronted with allegations that the Bank was facilitating terrorism financing, it initiated an investigation and offered its cooperation to the U.S. government. (Pls.' Resp. Def.'s Rule 56.1 Statement ¶¶ 24–25.) Furthermore, for substantial periods from 1998 to 2000, DIB was subject to regular audits and extensive oversight by the Dubai Government and the UAE Central Bank. (Pls.' Resp. Def.'s Rule 56.1 Statement ¶¶ 18, 40.)

These facts are materially different from the allegations on which this Court premised personal jurisdiction in 2010. Then, Plaintiffs' allegations against DIB depicted a financial

institution that was actively helping al Qaeda launder money in 1999, undeterred by the U.S. government's public calls for it to stop facilitating terrorism. Coupled with the Bank's intentional support for al Qaeda, allegations that bin Laden's "Chief Financial Officer" transferred "thousands of dollars . . . from DIB to two of the hijackers," who used the money for "training, including flight lessons, and other expenses incurred in preparing for the 9/11 terrorist attacks," provided a sufficient basis for jurisdiction. *Terrorist Attacks IV*, 718 F. Supp. 2d at 489–90. These key allegations lack factual support. DIB took steps before 9/11 to combat terrorism financing, including distributing OFAC lists and auditing account-opening procedures. (Pls.' Resp. Def.'s Rule 56.1 Statement ¶ 35.) The parties agree that bin Laden's CFO never held an account at DIB. (*Id.* ¶ 14.) And there is no specific evidence that funds from DIB accounts directly supported al Qaeda's operations or the 9/11 Attacks. (*Id.* ¶¶ 66–67.)

In 2010, the allegations against DIB put the Bank in the category of defendants that "provide[d] money laundering services directly for al Qaeda, assume[d] possession of and control over the monies, and t[ook] an active role in directing the flow of funds to and from al Qaeda and its operatives," to "intentionally . . . support some future attack to be planned by al Qaeda against the United States, [knowing] that the brunt of the injuries [would] be felt there." *Terrorist Attacks IV*, 718 F. Supp. 2d at 481. With the benefit of discovery, it is now clear DIB's role was more akin to a "passive conduit" through which funds were "indirectly channeled to and from al Qaeda." *Id.* at 489. Moreover, the evidence indicates that DIB lacked the general awareness required to be found to have been an aider-abettor of al Qaeda. *See Linde*, 882 F.3d at 329; *Kaplan*, 999 F.3d at 863–64. Plaintiffs' factual averments thus cannot establish minimum contacts via the effects test.

      *b. Concerted action theory fails to satisfy minimum contacts by DIB.*

"Concerted action" broadly refers to theories of liability that allow courts to hold defendants accountable for harm caused by others. *Halberstam*, 705 F.2d at 477. There are various

types of concerted action, including "conspiracy, or concerted action by agreement" and "aiding-abetting, or concerted action by substantial assistance." *Id.* at 477 (emphasis removed). The governing standards for "conspiracy" and "aiding-abetting" liability come from *Halberstam*, which Congress expressly incorporated via JASTA into ATA claims against persons. JASTA § 2(a)(5), 130 Stat. at 852; *see also Kaplan*, 999 F.3d at 851.

The Second Circuit has repurposed one theory of concerted action—conspiracy—for jurisdictional purposes. *See Schwab*, 883 F.3d 68. Under *Schwab*'s conspiracy theory of jurisdiction, courts can attribute to a defendant the in-forum contacts of another person or entity. To invoke this theory, a plaintiff must show: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [the forum] to subject that co-conspirator to jurisdiction in that [forum]." *Id.* at 87 (adopting Fourth Circuit's test from *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)).

For the first prong of the concerted action theory, the hallmark of a conspiracy is an "agreement between two or more persons . . . to participate in an unlawful act." *Halberstam*, 705 F.2d at 477. Evidence of an agreement may be "indirect" but must show that the parties share a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 79 (2d Cir. 2023) (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 39 (2d Cir. 2018)); *see also United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) ("[U]nless at least two persons have a *shared* purpose or stake in the promotion of an illegal objective, there is no conspiracy.").

Plaintiffs stumble at the first hurdle—proving a conspiracy existed. Plaintiffs assert that al Qaeda and DIB conspired to "attack[] . . . U.S. interests." (Pls.' Mem. Law Opp'n Mot. Summ. J.

at 19 n.7.)  To infer an agreement, Plaintiffs point to DIB's ties to extremists, Lootah's "friendship"

with bin Laden, and the Bank's "apparently witting" support of bin Laden's terrorist organization.

(*Id.* at 18–19); *see also Gelboim v. Bank of Am., Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (noting

that agreements between conspirators must often be inferred).  At most, these facts suggest that

DIB and Lootah knowingly facilitated financial transactions for individuals linked to al Qaeda, an

organization openly hostile to the United States.   (*See, e.g.,* Def.'s Resp. Pls.' Rule 56.1

Counterstatement ¶¶ 84, 92, 108, 165–68, 177.)  These facts are not indicative of—in the words of

Judge Learned Hand—a member of a conspiracy "promot[ing the illegal] venture himself,

mak[ing] it his own . . . ." *Parker*, 554 F.3d at 234 (quoting *United States v. Falcone*, 109 F.2 579,

581 (2d Cir. 1940)).  Presumably, if DIB *was* knowingly and intentionally complicit in al Qaeda's

plans to attack the United States, its support of al Qaeda would be at least somewhat connected to

al Qaeda's anti-American operations.

"[T]aken as a whole, the evidence points with at least as much force toward unilateral

actions by [al Qaeda] as toward conspiracy, and [this Court] would have to engage in

impermissible speculation to reach the latter conclusion." *Venture Tech., Inc. v. Nat'l Fuel Gas*,

685 F.2d 41, 48 (2d Cir. 1982).  Thus, the evidence does not meet Plaintiffs' burden to proffer

facts demonstrating the existence of a conspiracy.

Anticipating this conclusion, Plaintiffs invite this Court to extend the *Schwab* concerted

action theory to aiding and abetting.  However, the Supreme Court has admonished courts to

exercise "[g]reat care and reserve . . . when extending our notions of personal jurisdiction into the

international field." *Asahi Metal Industry Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 115 (1987)

(citation omitted).  Guided by this principle, this Court considers the absence of favorable

precedent, key differences between conspiracy and aiding-abetting liability, and the jurisdictional treatment of aiders-abettors in other contexts.

This Court is aware of no decision that applies the concerted action theory, as endorsed by *Schwab*, to alleged aiders-abettors. To the contrary, the Second Circuit has upheld this Court's decisions applying the *effects test*—not a concerted action theory—to defendants who allegedly aided and abetted al Qaeda. *See Terrorist Attacks III*, 538 F.3d at 95–96; *Terrorist Attacks VII*, 714 F.3d at 675–78; *see also LaSala v. Marfin Popular Bank Public Co.*, 410 F. App'x 474, 477 (3d Cir. 2011) (applying *Calder* effects test to alleged aider-abettor). Likewise, at least one other district court analyzing jurisdiction over defendants accused of both forms of concerted action have applied traditional minimum-contacts tests to aiders-abettors, reserving the *Schwab* theory for conspirators. *Collins v. Alonso, Andalkar & Facher, P.C.*, No. 20-cv-01504 (JCH), 2021 WL 4477289, at *6 (D. Conn. Sept. 30, 2021).

There is good reason to apply *Schwab* in the conspiracy context but not in the context of aiding and abetting. As courts have explained, the "underlying rationale for exercising personal jurisdiction on the basis of conspiracy" is that "the law deems co-conspirators to be each other's agents." *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 293 (S.D.N.Y. 2019) (citation omitted). The law attributes agents' forum contacts, unlike those of other third parties, to their principals. *Compare Schwab Short-Term Bond Market Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021) (permitting attribution based on *Schwab* theory), *with Walden v. Fiore*, 571 U.S. 277, 291 (2014) (prohibiting attribution of third parties' "unilateral activity" (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958))). The law does not deem aiders-abettors to be principals of those they assist, so attributing a principal's contacts to an aider-abettor would be constitutionally suspect.

This assessment is consistent with the appeals courts' treatment of out-of-forum actors who help parties violate court orders. In the seminal case on the issue, the Fifth Circuit held that a district court had jurisdiction over an out-of-state resident who had aided and abetted a party in violating a court order. *Waffenschmidt v. MacKay*, 763 F.2d 711 (5th Cir. 1985). The aider-abettor had no direct contacts to the forum, but the district court nevertheless found jurisdiction under its inherent authority and the *effects test*. The Fifth Circuit first reasoned that U.S. district courts have nationwide authority to enforce their orders and therefore have jurisdiction over non-parties with sufficient U.S. contacts who aid and abet violations of court orders. *Id.* at 717. Second, by knowingly helping a party violate a court order, the non-party is expressly aiming its conduct at the forum state—that is, this conduct meets the effects test. *Id.* at 723.

Other circuit courts have adopted one or both of these grounds—U.S. federal courts' nationwide authority to enforce court orders or the non-party expressly aiming its conduct at the forum state—to exercise personal jurisdiction over other American aiders-abettors lacking contacts to the forum. *See, e.g., ClearOne Commc'ns, Inc., v. Bowers*, 651 F.3d 1200, 1215–16 (10th Cir. 2011); *SEC v. Homa*, 514 F.3d 661, 673–75 (7th Cir. 2008). None has suggested that aiding and abetting *any* unlawful act will meet the effects test. *See, e.g., Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 230 (4th Cir. 2019) ("[T]he mere act of aiding and abetting is not always enough to provide minimum contacts."). A few circuits have explicitly cabined *Waffenschmidt* to domestic actors. *See, e.g., id.* at 232 ("[N]o court of appeals has extended the reasoning of *Waffenschmidt* to foreign conduct by foreign nationals . . . and we decline the Plaintiffs' invitation to become the first."); *Reebok Intern. Ltd. v. McLaughlin*, 49 F.3d 1387, 1391–92 (9th Cir. 1995). The Second Circuit has effectively done the same. Reluctant to apply *Waffenschmidt* to "a *foreign* nonparty with only limited contacts in the forum," it explained that

"the exercise of personal jurisdiction ... may depend, in part, on the nature of the foreign nonparty's contacts with the forum." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 137–38 (2d Cir. 2014).

As this consensus suggests, this Court should not extend *Schwab* to aiders and abettors because it "would violate due process for a district court to reach foreign aiders-and-abettors that lacked any contacts with the United States." *Hawkins*, 935 F.3d at 229. Therefore the undisputed facts as to DIB's actions do not satisfy minimum contacts under the concerted action theory.

## V.   CONCLUSION

Plaintiffs' proffered facts fail to meet the burden for establishing this Court's personal jurisdiction over DIB. Therefore, DIB's motion for summary judgment for lack of personal jurisdiction is GRANTED. DIB's request for an evidentiary hearing is DENIED as unnecessary and moot. DIB's request for oral argument is likewise DENIED.

The Clerk of Court is directed to close the open motions (ECF Nos. 8126 and 8534 in 03-md-01570; ECF Nos. 1134 and 1161 in 03-cv-06978; ECF Nos. 989 and 1035 in 03-cv-09849; ECF Nos. 812 and 836 in 04-cv-01923; ECF Nos. 726 and 749 in 04-cv-05970; ECF Nos. 668 and 691 in 04-cv-07065; ECF Nos. 710 and 739 in 04-cv-07279).

Dated: March     2023
New York, New York
MAR 0 9 2023

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

30